UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RONALD AVERY McPETERS,  )<br>            )<br>         Petitioner,  )<br>   vs.  )<br>            )<br>KEVIN CHAPPELL, as Acting Warden of San  )<br>Quentin State Prison,*  )<br>            )<br>         Respondent.  )<br>_____  ) | Case No. 1:95-cv-5108 LJO<br><br><u>DEATH</u> <u>PENALTY</u> <u>CASE</u><br><br>ORDER DIRECTING RESPONDENT TO MEET AND CONFER WITH FRESNO COUNTY DISTRICT ATTORNEY RE: SETTLEMENT |

---

\* Kevin Chappell, as Acting Warden of San Quentin State Prison, is substituted for his predecessor wardens and acting wardens pursuant to Federal Rule of Civil Procedure 25(d). The Clerk is directed to make the appropriate correction to the docket.

O4Respt2ConfWithDAreSettlement.McPwpd.wpd

1    This matter is before the Court following the decision by the United States Supreme Court in *Ryan v. Gonzales*, ___ U.S. ___, 2013 WL 68690 (Jan. 8, 2013). In the unanimous decision by Justice Thomas, the Court held that suspension of habeas proceedings for an indefinite period during a petitioner's mental incompetence "is inappropriate and merely frustrates the State's attempts to defend its presumptively valid judgment." *Id*. at ___, 2013 WL 68690, *11. The *Gonzales* decision overruled *Rohan ex rel. Gates v. Woodford*, 334 F.3d 803 (9th Cir. 2003) (holding that the statutory right to counsel under 18 U.S.C. § 3599(a)(2) carried with it a right of competence to assist counsel). *Id*. at ___, 2013 WL 68690, *5-*8.

On September 7, 2007, this Court issued an order based on the stipulation of the parties that the mental decomposition of Petitioner Ronald Avery McPeters ("McPeters") had rendered him unable to assist his appointed counsel with the prosecution of his federal habeas corpus petition and that pursuant to *Gates*, 334 F.3d 803, the proceedings should be stayed until McPeters could be restored to a level of competence (doc. 244). Since the *Gates* stay order was entered, McPeters' appointed counsel have submitted annual reports on the status of his condition. The last status report, filed September 27, 2012 (doc. 252), advised that mental health records maintained over the previous year revealed no material changes in his condition and that he consistently exhibited paranoia as well as a chronic psychotic disorder.

The facts before the Supreme Court in *Gonzales*, unlike the facts here, did not involve a stipulation between the parties about Gonzales' incompetence. Rather, in that case, the district court denied Gonzales' application to assess his competence to proceed with the litigation because the claims properly before the court "were record based or resolvable as a matter of law and thus would not benefit from Gonzales' input." *Id*. at ___, 2013 WL 68690, *3. The order staying the case came from the Ninth Circuit on mandamus, where the appellate court held that even though Gonzales' exhausted claims were record-based, he nonetheless was entitled to a stay pending a competency determination. *In re Gonzales*, 623 F.3d 1242. 1244 (2010).

Notwithstanding the factual distinction between *Gonzales* and the present case, the Court cannot ignore the mandate of the Supreme Court when it instructs: "when there is no reasonable hope of competence, a stay is inappropriate." *Gonzales*, ___ U.S. ___, 2013 WL 68690, *11. Nor is the Court

unaware that McPeters' enduring mental illness raises the issue of his amenability to execution under *Ford v. Wainwright*, 477 U.S. 399 (1986), even if habeas relief were to be denied.[1] It is with these foregoing principles in mind together with the ensuing review of the pertinent history of the case that the Court directs the Warden to meet and confer with the District Attorney of the County of Fresno (where McPeters was convicted) to discuss a course of action that brings the interests of the litigants, the Court, and the tax payers to the forefront.

I.   **Background**

McPeters was sentenced to death for the August 6, 1984 robbery and murder of Linda Pasnick at a Der Wienerschnitzel restaurant in Fresno, California. Mrs. Pasnick was shot three times through the driver's window of her car as she was leaving the restaurant with her meal. Two witnesses testified they saw McPeters leaning into Mrs. Pasnick's car through the driver's window at some point during the first three shots. After Mrs. Pasnick drove out of the parking lot, and lay wounded in her car, she was shot twice more. McPeters was seen by another witness in the street taking aim at Mrs. Pasnick's car through the passenger window. The basis for McPeters' death eligibility is the robbery-murder special circumstance codified in California Penal Code § 190.2(a)(17)(I). The robbery charge was predicated on the theory that when McPeters leaned into Mrs. Pasnick's car, he took her red bill-fold style wallet or an envelope containing $175 in cash, or both.

An evidentiary hearing was ordered on October 8, 2004 as to claims addressing McPeters' mental state at the crime and trial (doc. 182).[2] Under pre-AEDPA principles, an evidentiary hearing is a "matter of right where the facts are disputed and two conditions are met: (1) the petitioner's allegations would, if proved, entitle him to relief; and (2) the state court trier of fact has not, after a full and fair hearing,

---

[1] The principle holding from *Ford* is stated in the concurring opinion of Justice Powell, namely that the Eighth Amendment bars execution of "those who are unaware of the punishment they are about to suffer and why they are to suffer it." *Id.* at 422, *approved by Penry v. Lynaugh*, 492 U.S. 302, 333 (1989), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002).

[2] Claims addressing the continued viability of the robbery charge were reserved. After considering the parties' briefs, the Court determined on December 23, 2004 that further evidentiary development was unwarranted for claims challenging the robbery *conviction*, because the robbery-murder special circumstance was still viable under the theory of attempted robbery (doc. 191). The Court found uncontroverted evidence that McPeters reached into Mrs. Pasnick's car, thus justifying an attempted robbery finding, even if he did not actually take any personal property from her. Attempted robbery, like completed robbery, supports a robbery-murder special circumstance under California law.

reliably found the relevant facts. *Jones v. Wood*, 114 F.3d 1002,1010 (9th Cir. 1997), *citing Hendricks v. Vasquez*, 974 F.2d 1099, 1103 (9th Cir. 1992); *see Rich v. Calderon*, 187 F.3d 1064, 1067-68 (9th Cir. 1999); *Caro v. Calderon*, 165 F.3d 1223, 1226 (9th Cir. 1999); *Correll v. Stewart*, 137 F.3d 1404- 1411 (9th Cir. 1998).

In brief, the claims for which an evidentiary hearing was granted are described below.

**Claim 4:** That McPeters' defense counsel prejudicially failed to investigate or present an insanity defense.

Under applicable California law at the time of McPeters' trial, the standard for insanity was defined in the alternative by the two-pronged test derived from *M'Naghten's Case*. *See People v. Skinner*, 39 Cal. 3d 765, 768, 775 (1985). Insanity under this standard is established where the defendant proves by a preponderance of the evidence that he or she was incapable of *either* (1) knowing or understanding the nature and quality of his or her act, *or* (2) distinguishing right from wrong at the time of the commission of the offense. *Id*. at 768 (emphasis added). McPeters claims that a viable insanity defense could have been established by his offers of proof. The Warden contests McPeters' offers as contradicted, unsubstantiated, uncorroborated, insufficient, and unreliable. The Court ordered an evidentiary hearing to resolve the following disputed factual issues:

1. The circumstances in the handling and testing of McPeters' blood specimens as well as the description of the test results misled the jury to believe his system was free of drugs at the time of the offense.

2. In advance of trial, he spent much of his time at the Fresno County Jail in one of the four safety cells.

3. Numerous people observed him to be suffering from mental illness and drug intoxication during the 48 hours before the offense.

4. Immediately preceding the offense, he displayed poor memory, was unresponsive, looked dazed, and appeared to be under the influence of PCP and/or other drugs.

5. He was unable to remember personal information when arrested.

6. He exhibited overt symptoms of drug abuse and/or psychosis at booking into the Fresno County Jail.

7. He was placed in a safety cell and given anti-psychotic drugs after being booked into the jail.

8. He was given Haldol for several months in 1984 and 1985, beginning with the date of his arrest.

9. He did not respond when personally addressed by the trial court at arraignment following the preliminary hearing.

10. Purportedly negative drug screens of his blood do not diminish the viability of an insanity defense.

11. He had a known, long-term history of drug and alcohol abuse, auditory hallucinations, blackouts, and mental illness.

12. His mental health was adversely affected by the chronic and traumatic violence he witnessed between his parents as well as by severe physical and psychological abuse he personally endured.

**Claim 6:** That defense counsel prejudicially failed to investigate and present evidence that McPeters lacked the requisite mens rea for murder and robbery and was legally unconscious due to his mental illness and/or drug-induced psychosis in the days, weeks, and months preceding the offense.

The gravamen of Claim 6 is McPeters' assertion that if his defense attorney, Gerald Kahl had provided qualified experts with information about McPeters' behavior and appearance in the days prior to the offense, his chronic PCP use, the drug screens, and his elevated blood pressure reading and pulse rate at the time of arrest, the experts would have opined that the negative results of the conducted PCP tests were not reliable indicators of whether he was intoxicated at the time of the crime, but rather, that his behavior at the time of the offense was consistent with someone in a fugue or dissociated state who did not premeditate, deliberate, or harbor the necessary intent to rob or kill. With a few additions, the facts McPeters contends support Claim 6 and entitle him to further evidentiary development, including an evidentiary hearing, are the same as the facts presented to support Claim 4. The additions include

specific observations about McPeters having exhibited severe weight loss, poor hygiene, and memory lapses in the months preceding the offense as well as having complained of headaches in the year prior to the crime and while in County Jail. These are evidentiary details which add support to the contention that McPeters suffered from long-term drug abuse and mental illness at the time of the offense.

The disputed factual issues susceptible of resolution by further development include the following:

1. McPeters' mental and physical condition after his arrest and prior to his booking into the Fresno County Jail;

2. Whether McPeters was placed in a safety cell contemporaneous with his booking into the Fresno County Jail and the reasons therefor;

3. Whether anti-psychotic medication was prescribed for and administered to McPeters contemporaneous with his booking into the Fresno County Jail;

4. Whether Mr. Kahl abandoned his guilt phase defense strategy to present mental health experts because he was unable to establish a foundation of drug involvement;

5. Whether the test results of drug tests conducted on McPeters' blood were reliable indicators of his intoxication and/or mental state at the time of the offense;

6. Whether Mr. Kahl fully appreciated the import of the toxicological test results, erroneously accepted Mr. Cooper's inaccurate characterization that the blood vial which tested positive for PCP in an appreciable quantity was contaminated, and incompetently failed to investigate the matter himself; and

7. Whether the declarations of McPeters' mental health experts, including the turn around testimony of prosecution expert, psychiatrist Joel Fort, M.D., are based on reliable, supportable facts, including McPeters' alleged long-term history of drug and alcohol abuse.

**Claim 15:** That defense counsel unreasonably and prejudicially failed to correct and/or impeach the testimony of the prosecution psychiatrist expert.

McPeters contends his sentence of death is unconstitutional because Mr. Kahl did not develop or present evidence in mitigation to the aggravating circumstances introduced by the prosecution during the penalty proceedings. Four deficiencies are the subject of this claim. First, he claims Mr. Kahl did not make any attempt to correct or impeach the opinion rendered by psychiatrist Joel Fort, M.D. that McPeters was not psychotic or significantly under the influence of the present offense. Second, third, and fourth, he claims Mr. Kahl did not investigate or introduce evidence which would have ameliorated the aggravating nature of the circumstances surrounding the homicide of Walter Lieb, the assault on the McMorris brothers, or the altercation with Daniel Malcher.[3] The Court authorized further evidentiary development only as to the portion of Claim 15 challenging Mr. Kahl's failure to correct Dr. Fort's understanding of the facts and concomitant failure to impeach his opinions, denying the other allegations.

McPeters offer of proof is Dr. Fort's testimony repudiating this trial testimony based on an expanded understanding of the case derived from review of trial testimony of percipient witnesses, toxicology reports, mental health reports of various mental health experts, jail infirmary records, the prosecutor's opposition to retesting McPeters' blood sample, and declarations of various law enforcement personnel who observed McPeters at the time he was brought into the jail. Dr. Fort renounced his trial opinion as inaccurate "because of incomplete and misleading information" provided to him. With the additional information reviewed, he concluded that at the time of the offense, McPeters was functioning in a psychotic state due to a combination of preexisting, ongoing psychosis and recent use of PCP. He further averred that he would have revised is opinion during the trial proceedings if either counsel had brought to his attention additional information.

Separate and apart from Dr. Fort's renunciation of his trial opinion, McPeters challenges Mr. Kahl's professional competence for the following omissions:

>   1.      His failure to present Dr. Fort with evidence of recorded observations by jail personnel that McPeters was uncooperative, disturbed, confused, under the influence, and "5150" at booking;

---

[3] These three incidents were introduced during penalty proceedings as factors in aggravation to support the death penalty.

2.  His failure to provide Dr. Fort with reports of other mental health experts reporting McPeters' recent drug use in connection with his competence to stand trial;

3.  His failure to call into question Dr. Fort's conclusion that McPeters' behavior at the crime scene was goal-directed by presenting evidence of McPeters' bizarre behavior the night prior to the offense and his irrational behavior at the crime scene; and

4.  His failure to challenge Dr. Fort's opinion that McPeters' attempt to "escape" from the Acute Psychiatric Unit at Valley Medical Center ("APU") demonstrated he was feigning mental illness, which Mr. Kahl could have accomplished by presenting the eye witness account of the mental health worker who observed the "escape" to explain what really happened.[4]

**Claim 16:** That defense counsel unreasonably failed to investigate and present compelling mitigation evidence about McPeters' background, mental health history, drug abuse, and character.

The grant of further evidentiary development as to Claim 16 is addressed to anecdotal evidence of McPeters' disturbing childhood and drug use. Family member declarations submitted in post-conviction proceedings describe behavior of both parents toward their children as bordering on sadistic and violent toward each other, thus creating a terrifying existence. As a result of (or in addition to) his tumultuous family life, McPeters' scholastic performance is alleged to have been below average and his mental development marred by extreme introversion, nervousness, and fear. His tenuous coping ability is said to have been further compromised when he began using drugs which lead to paranoia and hallucinations.

The evidence to be introduced at the evidentiary hearing includes testimony consistent with these familial declarations. In additional, the Court directed McPeters to provide eye witness accounts

---

[4] The declaration testimony of the attending mental health worker, Woody Moreau, McPeters simply started to walk through and open door. Mr. Moreau averred McPeters did not appear to engaged in a stealth act, but rather, appeared disturbed and disoriented.

McPeters was using drugs contemporaneous with the offense, including documentary support by any medical establishment or law enforcement agency recording symptoms.[5]

**Claim 21:** That McPeters was prosecuted, convicted, and sentenced while mentally incompetent, unable to understand the proceedings or effectively communicate and assist trial counsel.

Claim 21 alleges that McPeters' due process rights were violated because he lacked the ability to consult meaningfully with counsel and to understand the proceedings. Claim 21 raises a claim of substantive due process because McPeters *was* incompetent at the time of trial.[6]

First relying on the jail infirmary records, safety cell records, and APU records, McPeters contends he was confined in one or more jail safety cells for the majority of his first ten months in jail and transferred to the APU for exhibiting psychotic behavior in June of 1985. Following his July 1, 1985 discharge from the APU, he was variously returned to safety cells through July 24, 1985, again on December 8, 1985, and again on May 9, 1986. His recorded psychotic behavior was manifested by hallucinations, as documented in the jail infirmary records, and by repeated instances of bizarre behavior, as reported in the safety cell records (to justify his confinement in those safety cells). Based on the declarations of his aunt, Juanita McPeters, his cousins, Hansel Baber and Levester Johnson, his brother Lonzel, and his sister, Denise, McPeters further points to lay observations of behavior consistent with psychosis and his incompetence to stand trial, including, suffering severe, chronic headaches, waving his arms in the air, yelling at non-existent people, mumbling to himself as if he were hearing voices, and generally exhibiting bizarre behavior. From the personal observations of defense experts Allen Middleton, Ph.D., Marham Kirsten, M.D., Paul Levy, M.D. and Mary Heatly, R.N. (the County Jail nurse present when McPeters was brought in for booking), as noted in their respective declarations, McPeters was actively hallucinating at the times these professionals were called upon to evaluate his behavior.

---

[5] Currently the evidence supporting McPeters' drug use is inferential, based on red, glassy eyes and "weird" behavior.

[6] Claims 7 and 23 similarly alleges McPeters' incompetence to be tried, but rather than a substantive due process violation, he relies on a procedural due process violation for the trial court's failure to hold a competence hearing *sua sponte*. The Court rejected the procedural due process claims in the October 8, 2004 order.

Next, McPeters claims his incompetence was evident from the fact of his surprising trial testimony that he was not present at the Der Wienerschnitzel restaurant on the day of the offense and that someone placed his fingerprints on his gun after it was wiped clean. This testimony was contrary to that of the several percipient witnesses who positively identified McPeters as having shot Mrs. Pasnick as well as the forensic evidence establishing McPeters' fingerprints on his gun and a ballistics match between bullets fired from this weapon and those recovered from Mrs. Pasnick's body. In a similar vein, McPeters contends he totally did not comprehend the nature, purpose, or content of the in camera hearing before Judge Stephen Henry directly after his trial testimony. The transcript of this hearing does intimate McPeters' general confusion and incoherence.

Finally, there is the expert testimony now offered in the various declarations that McPeters was incompetent to stand trial. Dr. Kirsten declared McPeters was not competent to assist his counsel in conducting his trial. Allan Hedberg, Ph.D. also opined that McPeters was incapable of meaningfully assisting counsel due to his mental impairments and that his competence during trial proceedings could not have been sustained without continued administration of anti-psychotic medication. David Foster. M.D. concluded McPeters' incompetence followed from his being out of touch with reality and his inability to understand the nature and consequences of his actions. Dr. Levy, like Dr. Hedberg, concluded that McPeters could not maintain any level of mental competence without anti-psychotic medications and the abrupt discontinuation of anti-psychotic medication was medically ill-advised. Further, the fact that Dr. Levy determined McPeters to be competent to stand trial in October of 1985 had no bearing on whether he was competent to stand trial four months later.[7] In Dr. Levy's opinion, McPeters mental competency should have been continuously monitored up to and throughout his trial. Dr. Middleton stated that McPeters was incompetent to stand trial because he did not grasp the nature of the legal proceedings or understand the strategies undertaken on his behalf. Social historian Shirley Reece, M.S.W. opined McPeters was not competent to assist his trial counsel at trial and has continued in a psychotic state in San Quentin State Prison.

**Claim 22:** That McPeters was deprived access to and assistance of appropriate experts to prepare and present his defense.

---

[7] Jury selection commenced on February 3, 1986.

1       Claim 22 alleges an additional theory for further evidentiary development of Claims 4, 6, 15, 16, and 21, that is, he was deprived of the assistance of competent mental health examinations to assist in his defense under *Ake v. Oklahoma*, 470 U.S. 68 (1985), *because* of the constitutionally ineffective representation of his attorney.[8] McPeters claims that had Mr. Kahl developed and provided the mental health evidence described in Claims 4, 6, and 15, as well as the background evidence referred to in Claim 16 to mental health experts, those experts would have provided testimony consistent with guilt phase and penalty phase defenses. In addition, he alleges, defense mental health experts would have determined McPeters incompetent to stand trial, as alleged in Claim 21.

## II.    Discussion

      Were the Court to proceed with an evidentiary hearing on the above-referenced claims and to determine the mental state issues to be so compelling that relief must be granted, the matter ultimately could be returned to the Fresno Superior Court for retrial.[9] Given McPeters' current mental state, which appears to be at best static, McPeters could not be retried. *See* Cal. Pen. Code § 1368. In that event, he would become the responsibility of the County, possibly for as long as he lives.

      On the other hand, if after proceeding with an evidentiary hearing the Court were to determine relief should not be granted and all appeals were to favor the Warden, McPeters would resort to a claim challenging any ensuing execution proceedings on the ground that he is incompetent to be executed under *Ford*, 477 U.S. 399. The state court would then be obliged to conduct a hearing at which McPeters could submit his own psychiatric evidence. *See Panetta v. Quarterman*, 551 U.S. 930 949-50 (2007) (quoting *Ford*, 447 U.S. at 427 (Powell, J. plurality opn.)). Should the state court enter an order unfavorable to McPeters, the matter very well could end up again before this Court.

      Either way, if McPeters remains as mentally impaired in the future as he is currently, the chances the State of California will be able to carry out execution of his death sentence are remote, at best. The case is ripe for resolution, which, in turn will promote judicial economy and stem further taxpayer expenditure on pointless litigation. Yet, members of the federal bench in the California District Courts

---

[8] Claim 22 also claims the deprivation of mental health assistance due to prosecutorial misconduct. The Court rejected this basis.

[9] The Court does not discount the possibility that the Warden may appeal a decision favorable to McPeters. This text is drawing a hypothetical.

have been informed by various deputy attorneys general, that the Warden does not have settlement authority in federal cases reviewing state convictions.  That authority is said to remain vested in the County District Attorneys.

Because the Court can see clearly that further litigation of McPeters' case very likely will not alter his need for ongoing psychiatric treatment, and necessarily will cost taxpayers tens of thousands dollars, the State Attorney General is directed to meet and confer with the District Attorney of Fresno County to discuss the potential of settlement in light of this order.

### III.    Return on this Directive

The Warden's counsel shall make contact with the District Attorney of Fresno within seven days (one calendar week) from entry of this order to discuss the District Attorney's position on settlement. To facilitate discussions between the District Attorney and the Attorney General, the Court is providing a courtesy copy of this order to the District Attorney.

Following contact, the Warden shall make arrangements to confer in depth with the District Attorney within three (calendar) weeks of the entry of this order (if necessary), and to provide a status report of said discussions within four (calendar) weeks of the entry of this order.

Nothing in this order shall preclude appointed counsel for McPeters, the Habeas Corpus Resource Center, from participating in any discussions with the Warden or the District Attorney or both.

IT IS SO ORDERED.

Dated:    January 29, 2013

                                                                /s/ Lawrence J. O'Neill  
                                                                 Lawrence J. O'Neill  
                                                          United States District Judge